PUBLIC VERSION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re:<br>TOUSA, INC., *et al.*,<br><br>    Debtors. | Chapter 11 Cases<br><br>Case No. 08-10928-JKO<br><br>Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF TOUSA, INC., *et al*.<br><br>    Plaintiff,<br><br>  vs.<br><br>FALCONE/TEP HOLDINGS, LLC f/k/a<br>FALCONE/RITCHIE LLC; TEP HOLDINGS,<br>INC. f/k/a TRANSEASTERN PROPERTIES,<br>INC.; ARTHUR J. FALCONE; EDWARD W.<br>FALCONE; BAYSHORE 65 LANDBANK, LLC;<br>BF SOUTH JACKSONVILLE PROPERTIES<br>LLC; BIGWATER PARTNERS, LLC; BRUCE B.<br>DOWNS PARTNERS, LLC; CENTURY<br>COMMUNICATIONS OF FLORIDA, INC.;<br>CENTURY MARKETING INTERNATIONAL,<br>LLC; COLONIAL CROSSING ASSOCIATES,<br>LLC; CORAL LAKES LANDBANK, LLC;<br>FALCON FT. PIERCE ORANGE, LLC;<br>FALCON FUNDING, LLC; FALCON LAND &<br>DEVELOPMENT, LLC; FALCONE VILLAGE<br>CENTER PARTNERS, LLC; HELLER 301<br>PARTNERS INVESTORS, LLC;<br>INDEPENDENCE LAND DEVELOPMENT 23,<br>LLC; INDEPENDENCE LAND<br>DEVELOPMENT, LLC; LIVE OAK<br>DEVELOPMENT I, LLC<br>LIVE OAK DEVELOPMENT II, LLC; LIVE<br>OAK LANDBANK 2, LLC; MOSS PARK<br>LANDCO, LLC; NICKMATDEN LANDBANK,<br>LLC; NORTH CAPE DEVELOPMENT<br>ASSOCIATION I, LLC; NORTH CAPE<br>DEVELOPMENT ASSOCIATION II, LLC;<br>NORTH CAPE DEVELOPMENT<br>ASSOCIATION III, LLC; OAK CREEK | Adv. Pro. No. [_____] |

PUBLIC VERSION

LANDBANK LLC; R&F 44 JACKSONVILLE, LLC; SERVICES MANAGEMENT, LLC; TAMPA BAY LANDCO II, LLC; HELLER 301 LANDBANK, LLC; TEP OF TRADITION, LLC; TEPSR7, LLC; TEP ANTHONY GROVES, INC.; TEP BAYSHORE, LLC; TEP BRONSON, LLC; TEP CORAL LAKES, LLC; TEP CYPRESS LANDING, LLC; TEP DANIEL'S LANDING, LLC; TEP HAMMOCKS, LLC; TEP HELLER, LLC; TEP HOMES, INC; TEP INDEPENDENCE, LLC; TEP JONATHAN'S BAY, LLC; TEP KENDALL POINTE, LLC; TEP LAGUNA LAKES, LLC; TEP LEGACY PARK, LLC; TEP OAK CREEK II, LLC; TEP OAK CREEK, LLC; TEP OLYMPIA POINTE, LLC; TEP SAVANNAH, LLC; TEP TRADITION, LLC; TEP VERSAILLES, LLC; TEP VICTORIA DUVAL, LLC; TEP VILLA CAPRI AT METROWEST, LLC; TEP VIZCAYA, LLC; TEP WESTON RESERVE, LLC; TEP YOUNG PINES, LLC; WESTWOOD BERKSHIRE LANDBANK, LLC; WI 825 PARTNERS, LLC; 825 INVESTMENTS, LLC; LTK TRANS01, LLC; BAYSHORE 65 PARTNERS, LLC; FORT PIERCE ORANGE AVENUE LANDBANK, LLC; KENDALL POINTE LAND DEVELOPMENT, LLC; SOUTH JACKSONVILLE PROPERTIES, LLC; JACKSONVILLE WEST 95 PARTNERS, LLC; NORTH CAPE HOLDINGS, LLC; WESTWOOD 1191 ASSOCIATES, LLC; FALCON 95 PARTNERS, LLC; CARROLL DYER LANDBANK, LLC; BRONSON DRI PARTNERS, LLC; KENDALL LAND DEVELOPMENT, LLC; BOSCHETTI CAPITAL PARTNERS, LLC; PRESTIGE BUILDERS CAPITAL INVESTMENTS, LLC; JOSE BOSCHETTI; SYLVIA BOSCHETTI; MARTIN CAPARROS, JR.; PATRICIA CAPARROS; AND VIZCAYA IN KENDALL COMMUNITY DEVELOPMENT DISTRICT

Defendants.

PUBLIC VERSION

## ADVERSARY COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of TOUSA, Inc., et al. (collectively, the "Debtors"), by and through its undersigned counsel, on behalf of and as the representative of the Debtors' estates, based upon information and belief and as a result of its investigation to date, alleges as follows:

## PRELIMINARY STATEMENT

1.      The Plaintiff seeks in this adversary proceeding to avoid and recover more than $54 million (the "Cash Transfers") which certain of the Defendants received in the midst of the crashing credit and housing market crisis in July 2007, as part of a global settlement of litigation that arose out of a disastrous business venture between certain of the Debtors and the Defendants. The Plaintiff also seeks to avoid the transfers of releases, pledges of indemnification, and other rights and obligations provided to benefit the Falcone Entities and the Kendall Entities (both as defined below) as part of the same global settlement (the "Release and Obligation Transfers" and, together with the Cash Transfers, the "Fraudulent Transfers").

2.      During the summer of 2005, Debtor TOUSA Homes LP ("Homes LP") and certain Falcone Entities formed TE/TOUSA LLC ("TE/TOUSA") in order to acquire substantially all of the homebuilding assets of Transeastern Properties, Inc. (the "Transeastern Acquisition"). The TE/TOUSA entity became known as the Transeastern Joint Venture (the "Transeastern JV"). In order to fund the Transeastern Acquisition, the Transeastern JV Subsidiaries (as defined below) entered into three credit agreements totaling $675 million (the "Transeastern Debt"), which were supported by guaranties executed by TOUSA, Inc. ("TOUSA") and Homes LP. Notably, aside from TOUSA and Homes LP who executed certain

PUBLIC VERSION

guaranties in connection with the Transeastern Acquisition, no other Debtor was liable for the Transeastern Debt.

3.      The Transeastern JV quickly floundered and by November 2006, certain lenders (the "Transeastern Lenders") sued TOUSA and Homes LP on account of the Transeastern Debt. Also in November 2006, certain of the Falcone Entities provided notice that the Transeastern JV was in default of certain option agreements with the Falcone Entities due to the failure of the Transeastern JV to remit tens of millions of dollars in payments contractually owed to such Falcone Entities.  In light of the various law suits and defaults, the Debtors consummated a multi-tiered "global settlement" among numerous parties, including TOUSA, Homes LP, the Falcone Entities, and the Transeastern Lenders (the "Transeastern Settlement").

4.      As part of the Transeastern Settlement, TOUSA; Homes LP; TOUSA, LLC; TOI, LLC; and the Transeastern JV (the "TOUSA Entities"), and the Falcone Entities entered into a Settlement and Release Agreement on May 30, 2007 (together with amendments and restatements, the "TOUSA/Falcone Settlement"), by which certain of the Falcone Entities received over $50 million in exchange for a portion of their assets, and additional payments to cover certain costs related to the Transeastern JV.  By virtue of the Release and Obligation Transfers, the Falcone Entities were also released and indemnified from any further obligations or liabilities arising out of the Transeastern JV, including their guaranty obligations to the Transeastern Lenders, and were promised that the TOUSA Entities would continue paying certain costs in connection with winding down projects post-settlement.  The TOUSA/Falcone Settlement is attached to this Complaint as Exhibit A.

5.      In addition, pursuant to the Transeastern Settlement, the TOUSA Entities entered into a settlement and release agreement on June 29, 2007 (the "TOUSA/Kendall Settlement")

with the Kendall Entities (as defined below and, together with the Falcone Entities and Vizcaya

in Kendall Community Development District, the "Defendants").  The TOUSA/Kendall

Settlement terminated option and construction agreements between the Transeastern JV and the

Kendall Entities, settled claims that arose out of the Transeastern JV's real estate project known

as "Kendall Commons," and provided that the Kendall Entities be paid millions of dollars and

receive "non-cash" transfers in the form of releases and other obligations by the TOUSA Entities.

The TOUSA/Kendall Settlement is attached to this Complaint as Exhibit B.

6.     The funding for the Cash Transfers to the Defendants was made possible,

however, only because TOUSA and Homes LP forced certain of their direct and indirect

subsidiaries (the "Conveying Subsidiaries") to become co-borrowers and guarantors under

secured credit facilities with the New Lenders (as defined below).  The proceeds of these credit

facilities were used to satisfy the Transeastern Debt, fund the settlement with the Transeastern

Lenders, and fund the TOUSA/Falcone Settlement and the TOUSA/Kendall Settlement (together

with the Williams Island Amendment (as defined below), the Oak Creek and Westwood

Settlement (as defined below), and the Warranty Settlement (as defined below), the "JV

Settlements"), which included both Cash Transfers and the provision of the Release and

Obligation Transfers.

7.     The Conveying Subsidiaries financed the JV Settlements notwithstanding the fact

that the Conveying Subsidiaries were not obligated on the Transeastern Debt, were not involved

with the Transeastern JV, and were not parties to the litigation underlying the Transeastern

Settlement.

8.     The Conveying Subsidiaries did not benefit from the acquisition of the

Transeastern JV assets from certain of the Falcone Entities, nor did they benefit from any other

**PUBLIC VERSION**

consideration that was transferred in connection with the JV Settlements.  Indeed, nearly all of

the Conveying Subsidiaries received nothing in return for taking on new debt to fund the JV

Settlements, while TOUSA Homes Florida, LP ("Homes Florida") received assets from the

wound-down Transeastern JV that were encumbered by more liabilities than such assets were

worth.  Accordingly, the Debtors did not receive reasonably equivalent value for the transfers to

the Defendants in connection with the JV Settlements.

9.       At the time of the Fraudulent Transfers, the Debtors, both individually and on a

consolidated basis, were (i) either insolvent or rendered insolvent, (ii) left with unreasonably

small capital, or (iii) unable to pay their debts as they were to come due.

10.      Thus, the Committee seeks to avoid and recover the Cash Transfers, and seeks to

avoid the Release and Obligation Transfers, on behalf of and for the benefit of the Debtors'

estates as constructively fraudulent conveyances under applicable bankruptcy and non-

bankruptcy law.

## PARTIES

11.      Prior to announcing their wind-down, the Debtors and their non-Debtor affiliates

(collectively, the "TOUSA Companies") designed, built, and marketed detached single-family

residences, town homes, and condominiums, and operated in various metropolitan markets in ten

states, located in four major geographic regions:  Florida, the Mid-Atlantic, Texas, and the West.

On January 29, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

12.      Plaintiff Committee was appointed by the Office of the United States Trustee for

the Southern District of Florida pursuant to Bankruptcy Code section 1102 on February 13, 2008.

The Committee brings the claims herein derivatively on behalf of and for the benefit of TOUSA,

Homes LP, and the estates of the following Debtors:  Engle Homes Commercial Construction,

**PUBLIC VERSION**

LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, LLC; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, LP; Newmark Homes, LLC; Newmark Homes, LP; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, LLC; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; Homes Florida; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. (collectively, the "Conveying Subsidiaries").

13.     In 2005, the assets of Transeastern Properties Inc. ("Transeastern") were sold to EH/Transeastern LLC ("EHT") in exchange for which, Falcone/TEP Holdings, LLC f/k/a Falcone/Ritchie LLC ("Falcone/Ritchie") acquired a 50% ownership interest in TE/TOUSA, which, in turn, owned EHT.  At the time of its acquisition, Transeastern was the fourth largest private homebuilder in Florida.

14.     Defendants Arthur J. Falcone and Edward W. Falcone (the "Falcones") were the founders of Transeastern and were also the majority owners of Transeastern until the Transeastern Acquisition.

15.     Defendant Live Oak Landbank 2, LLC ("Live Oak") is a Florida limited liability company.  Robert J. Falcone, as Trustee of the Robert J. Falcone Revocable Living Trust, signed the TOUSA/Falcone Settlement on Live Oak's behalf.

16.     Defendant Independence Land Development 23, LLC ("Independence") is a Florida limited liability company.  Anthony Ciabattoni, manager of Independence, signed the TOUSA/Falcone Settlement on Independence's behalf.

17.     The remaining Defendants who were parties to the TOUSA/Falcone Settlement are listed as "Additional Falcone Entities" in Schedule 1 of the TOUSA/Falcone Settlement, (collectively with Falcone/Ritchie, the Falcones, Live Oak, and Independence, the "Falcone Entities").  Some of these Falcone Entities are affiliates of Falcone/Ritchie, the Falcones, or Transeastern and were parties to certain option, construction, joint development, cooperation and other agreements which were executed in connection with the development of Transeastern-related tracts of land.  All of the Falcone Entities were beneficiaries of the TOUSA/Falcone Settlement and received Cash Transfers and/or Release and Obligation Transfers.

18.     Defendant Kendall Land Development, LLC ("Kendall"), a Florida limited liability company organized by Defendants Jose Boschetti and Martin Caparros, Jr., and together with Defendants Boschetti Capital Partners, LLC; Prestige Builders Capital Investments, LLC; Sylvia Boschetti; and Patricia Caparros (collectively the "Kendall Entities")

REDACTED

19.     Defendant Vizcaya in Kendall Community Development District ("Vizcaya") is a Florida special purpose government entity,

REDACTED

20.     The Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure, made applicable by Rule 7020 of the Federal Rules of Bankruptcy Procedure, because the right to relief asserted against them arises out of the same

transaction, occurrence, or series of transactions and occurrences, and common questions of law and fact.

## BACKGROUND

A.    **The Transeastern Joint Venture and Acquisition**

21.    In March 2005, Homes LP and Falcone/Ritchie, an entity controlled by the Falcones, formed TE/TOUSA and several other subsidiaries including EHT to effectuate the formation of the Transeastern JV and the Transeastern JV's acquisition of Transeastern's assets. In June 2005, EHT entered into an Asset Purchase Agreement with Transeastern, the Falcones, Falcone/Ritchie and certain other Falcone Entities by which EHT agreed to buy all of Transeastern's home building assets, and to assume certain liabilities, in exchange for Falcone/Richie receiving fifty percent (50%) of the membership interests in the Transeastern JV. Homes LP acquired the other 50% membership interest in the Transeastern JV and was its managing member.

22.    In August 2005, the Transeastern JV completed the acquisition of substantially all of the homebuilding assets of Transeastern for more than $800 million.  To finance this transaction, the Transeastern JV created four special purpose subsidiaries (the "Transeastern JV Subsidiaries") including: (i) EHT, the primary operating subsidiary of the Transeastern JV; (ii) TE/TOUSA Senior, LLC ("TOUSA Senior"), managing member and sole owner of EHT; (iii) TE/TOUSA Mezzanine LLC ("TOUSA Mezz"), which owned all of the membership interests in TOUSA Senior; and (iv) TE/TOUSA Mezzanine Two LLC ("TOUSA Mezz II"), which owned all of the membership interests in TOUSA Mezzanine LLC.  Three of the four Transeastern JV

PUBLIC VERSION

Subsidiaries entered into credit agreements with separate groups of lenders, each dated August 1, 2005 (collectively, the "Transeastern Credit Agreements"),[1] totaling $675 million, as follows:

    (i)    a $450,000,000 Credit Agreement (the "Senior Credit Agreement")[2] entered into by EHT with TOUSA Senior, LLC, as co-borrower;

    (ii)    a $137,500,000 Senior Mezzanine Credit Agreement (the "Senior Mezzanine Credit Agreement")[3] with TOUSA Mezz, as borrower; and

    (iii)    an $87,500,000 Junior Mezzanine Credit Agreement (the "Junior Mezzanine Credit Agreement") with TOUSA Mezz II, as borrower.

23.    In order to effectuate the Transeastern Acquisition, TOUSA provided a $20 million subordinated bridge loan and TOUSA and the Falcone Entities contributed $165 million of equity (of which $90 million was contributed by TOUSA and $75 was contributed by Falcone/Ritchie LLC).

24.    As a condition precedent to the Transeastern Credit Agreements, TOUSA and Homes LP (the "TOUSA Guarantors") executed three unsecured completion guaranties and three unsecured carve-out guaranties (collectively, the "TOUSA Guaranties").  Falcone/Ritchie also executed carve-out guaranties for each of the credit agreements in favor of the Transeastern Lenders.

---

[1] Deutsche Bank Trust Company Americas ("DB Trust") was the original administrative agent under the Transeastern Credit Agreements, and Deutsche Bank Securities Inc. ("DB Securities") was the sole lead arranger and sole book running manager thereunder.  On March 13, 2007, The CIT Group/Business Credit, Inc. ("CIT") replaced DB Trust and DB Securities as administrative agent, lead arranger, and book running manager for the Transeastern Credit Agreements.

[2] The Senior Credit Agreement was secured by first priority liens on substantially all of the assets of EHT including, without limitation, real estate and options contracts.

[3] The Senior Mezzanine Credit Agreement and the Junior Mezzanine Credit Agreement were secured by liens on ownership interests in certain of the Transeastern JV Subsidiaries.

**PUBLIC VERSION**

25.     Only the Transeastern JV, its subsidiaries, Falcone/Ritchie, TOUSA and Homes LP had any obligations in connection with the Transeastern Debt.  None of the Conveying Subsidiaries were obligors under the Transeastern Credit Agreements.

**B.     The Prepetition Transeastern Litigation**

26.     In October 2006 the Transeastern JV was put on notice by certain Falcone Entities of alleged payment defaults on four option agreements.

27.     On October 31, 2006, and November 1, 2006, the TOUSA Guarantors received demand letters from DB Trust requiring payment under the TOUSA Guaranties.  The demand letters alleged that potential defaults and events of default had occurred under the Transeastern Credit Agreements triggering the TOUSA Guarantors' obligations.

28.     On November 28, 2006, the TOUSA Guarantors filed a declaratory action in Florida state court against DB Trust seeking a declaration that the TOUSA Guarantors' obligations had not been triggered and/or that their exposure under the TOUSA Guaranties differed from what DB Trust alleged in the demand letters (the "Florida Action").[4]

29.     On November 29, 2006, DB Trust filed suit in New York against the TOUSA Guarantors asserting claims allegedly arising out of DB Trust's rights under the TOUSA Guaranties (the "New York Action").

30.     DB Trust was the Administrative Agent under the Transeastern Credit Agreements from the inception of the agreements through March 13, 2007.  In addition, DB Securities acted as financial advisor to certain of the TOUSA Guarantors and Transeastern JV Subsidiaries in connection with the Transeastern Acquisition, pursuant to a letter agreement (the "DB Letter

---

[4] On April 27, 2007, the Florida Action was dismissed without prejudice by stipulation of the parties.

Agreement"). On March 26, 2007, DB Securities commenced an action in New York for claims allegedly arising out of the DB Letter Agreement (the "DB Securities Action" and, together with the Florida Action and the New York Action, the "Prepetition Transeastern Litigation").

31.    As the Conveying Subsidiaries were not liable for any of the Transeastern Debt, they were not parties to the Prepetition Transeastern Litigation.


**C.    The Transeastern Settlement**

32.    Between January 2007 and July 2007, the parties to the Prepetition Transeastern Litigation engaged in negotiations with the administrative agents for the Transeastern Credit Agreements, the Senior Secured lenders, the Senior and Junior Mezzanine lenders, the Falcone Entities and other third parties who were involved in disputes with respect to the Transeastern JV.

33.    On July 31, 2007, TOUSA consummated the Transeastern Settlement, which included a payment to the Transeastern Lenders of more than $421 million in satisfaction of the Transeastern Debt and termination of the Prepetition Transeastern Litigation. The Transeastern Settlement, and the incurrence of the New Debt (as defined below) by the Conveying Subsidiaries to finance the Transeastern Settlement, was held by this Court to, among other things, constitute a series of constructively fraudulent conveyances. (Case No. 08-10928-JKO, Adv. Pro. No. 08-01435 (JKO), D.E. #658).

34.    As part of the global Transeastern Settlement, the JV Settlements were entered into and were predicated on the consummation of the global Transeastern Settlement.


**D.    Terms of the TOUSA/Falcone Settlement**

35.    The TOUSA/Falcone Settlement involved the exchange of property, money, releases and promises of indemnification. It also resulted in the Falcone Entities' complete

withdrawal from the Transeastern JV.  The parties to the TOUSA/Falcone Settlement were the

Falcone Entities and the TOUSA Entities.

36.     First, through the TOUSA/Falcone Settlement, EHT acquired title to certain

properties owned by the Falcone Entities in exchange for TOUSA's payment of certain takedown

costs, closing costs and option payments pursuant to existing option contracts.  On or about July

31, 2007, in satisfaction of this portion of the TOUSA/Falcone Settlement, TOUSA caused

$50,091,786.38 of the proceeds of the New Debt to be transferred to Defendants Live Oak and

Independence.[5]

37.     Second, the TOUSA/Falcone Settlement provided for the total withdrawal of the

Falcone Entities from the Transeastern JV.  Accordingly, on July 31, 2007, immediately before

the TOUSA/Falcone Settlement became effective (the "Effective Date"), Falcone/Ritchie

resigned and withdrew as a member of the Transeastern JV and notified TE/TOUSA of this

withdrawal in writing.  Once it had withdrawn, Falcone/Ritchie's membership interests in the

Transeastern JV were immediately deemed cancelled and Falcone/Ritchie retained no ownership

interest in the Transeastern JV.  Upon withdrawal, Falcone/Ritchie (together with its members,

officers, directors, employees, representatives, agents, advisors and affiliates) was discharged of

and from any further obligation, restriction or agreement contained in the operating agreement

which governed the Transeastern JV.  Also on the Effective Date, the Falcones and all of the

Falcone Entities were deemed to have resigned from any and all positions as officer, director or

other official positions of any of the Transeastern JV entities.

38.     Third, as part of the TOUSA/Falcone Settlement, the TOUSA Entities provided

the Falcone Entities with certain releases and indemnities.  In particular, the TOUSA/Falcone

---

[5] The takedown payments were comprised of $13,504,645 to Defendant Live Oak and $35,982,294 to Defendant
Independence.

**PUBLIC VERSION**

Settlement provided that the Falcone Entities would be released from any and all claims, demands, rights, actions or causes of action of any kind or nature whatsoever, including but not limited to claims arising out of or in connection with the Transeastern carve-out guaranties, the original Transeastern JV purchase agreement, the operating agreement which governed the Transeastern JV, and certain option, development, and land bank agreements entered into by the TOUSA Entities and the Falcone Entities.

39.     The TOUSA/Falcone Settlement also provided that in the event that any third-party creditors of the Transeastern JV commenced or asserted any claim, complaint, action or proceeding against Falcone/Ritchie (or any of its members, officers, directors, employees, representatives, agents, advisors or affiliates) based on any action or inaction relating to the operation of the Transeastern JV where the alleged action constituted actual fraud, bad faith, criminal or other intentional or willful misconduct, the TOUSA Entities were obligated to indemnify and hold harmless the Falcone Entities.

40.     Additionally, the TOUSA Entities were compelled by the TOUSA/Falcone Settlement to assume EHT's indemnification obligations to the Falcone Entities with respect to any third-party claims relating to obligations which survived EHT's acquisition of certain properties once owned by the Falcone Entities.

41.     The TOUSA/Falcone Settlement also terminated various of the Transeastern JV's option contracts and construction projects.  In connection with the TOUSA/Falcone Settlement's termination of land bank agreements and construction projects, the TOUSA Entities agreed to pay certain costs to the Falcone Entities, such as carrying costs and property taxes.  On or about July 29, 2007, in addition to the approximately $50 million that TOUSA wired to Defendants Live Oak and Independence in take down payments, TOUSA also arranged for additional

transfers of cash to be wired to the Falcone Entities for other costs in connection with the TOUSA/Falcone Settlement.

42.     The TOUSA/Falcone Settlement provided the TOUSA Entities with full ownership of the assets of the Transeastern JV, certain releases and indemnities from the Falcone Entities, and other consideration.

43.     Subsequent to the TOUSA/Falcone Settlement's execution, the following, related agreements conveying Cash Transfers and Release and Obligation Transfers were entered into:

REDACTED

E.     **Terms of the TOUSA/Kendall Settlement**

44.     The TOUSA/Kendall Settlement

REDACTED

15

**PUBLIC VERSION**

REDACTED

## F.    **The New Credit Agreements**

47.    In order to fund the JV Settlements and the related Cash Transfers to the Defendants, in addition to the payments made under the settlement with the Transeastern Lenders, TOUSA, as borrower, together with Homes LP and the Conveying Subsidiaries, as both co-borrowers and guarantors, entered into the following secured credit facilities on July 31, 2007 (the "Transfer Date"):

(i)    Second Amended and Restated Revolving Credit Agreement (the "Amended Revolver Agreement") with Citicorp, as Administrative Agent, and certain other lending institutions (the "Revolving Debt");[6]

(ii)    $200 million first lien term loan facility (the "First Lien Term Credit Agreement") with Citicorp, as Administrative Agent, and certain other lending institutions (the "First Lien Term Loan");[7] and

(iii)    $300 million second lien term loan facility (the "Second Lien Term Credit Agreement," and together with the Amended Revolver Agreement and the First Lien Term Loan Agreement, the "New Credit Agreements") with Citicorp, as Administrative Agent,[8] and certain other lending institutions (the

---

[6] As of the Petition Date, approximately $316.5 million was outstanding under the Amended Revolver Agreement in respect of revolving loans and letters of credit.

[7] As of the Petition Date, approximately $199 million was outstanding under the First Lien Term Loan.

[8] On or about January 28, 2008, Citicorp resigned as administrative agent under the Second Lien Term Loan and was replaced by Wells Fargo.

**PUBLIC VERSION**

"Second Lien Term Loan"[9] and, together with the First Lien Term Loan, the "New Debt").

48.    The obligations under the Revolving Debt and First Lien Term Credit Agreement (together, the "First Lien Indebtedness") were allegedly secured by first priority liens on, among other things, the property and assets of all of the Debtors, whether real or personal, tangible or intangible, and wherever located (the "Prepetition Collateral"). The obligations under the Second Lien Term Credit Agreement were allegedly secured by a second priority lien on the Prepetition Collateral. An intercreditor agreement, dated July 31, 2007, governs the respective rights of the lenders under the First Lien Indebtedness and the lenders under the Second Lien Term Loan. As noted above, this Court has previously held that the incurrence of the New Debt by the Conveying Subsidiaries was a constructively fraudulent transfer and the receipt of proceeds of the New Debt by the Senior Lenders also was constructively fraudulent.

**G.    The Transfers Made to Defendants Under the JV Settlements Were Constructively Fraudulent**

49.    The Fraudulent Transfers to the Defendants were made with proceeds from the New Debt which was incurred by the Debtors and secured by liens on the assets of the Debtors. On July 31, 2007, the same day that the Debtors entered into the New Credit Agreements, TOUSA instructed Citicorp to wire transfer proceeds from the New Debt to certain of the Defendants. These Cash Transfers were in consideration of the JV Settlements.

50.    The Debtors received no benefit or less than reasonably equivalent benefit from the settlement of the Prepetition Transeastern Litigation, the acquisition of the Transeastern JV assets and the provision of releases and promises of indemnification and other obligations to the Defendants. Indeed, as to the Conveying Subsidiaries in particular, TOUSA never considered

---

[9] As of the Petition Date, approximately $317 million was outstanding under the Second Lien Term Loan.

PUBLIC VERSION

whether these Debtors would receive reasonable value in exchange for the obligations they incurred. Among other things:

- The claims that were settled with the proceeds of the New Debt were solely against TOUSA and Homes LP, not the Conveying Subsidiaries. The settlement of the Prepetition Transeastern Litigation did not improve the day-to-day operations of the Conveying Subsidiaries.

- The Conveying Subsidiaries received no value in the form of debt relief from the Transeastern Settlement in general, or the TOUSA/Falcone Settlement in particular.

- The Conveying Subsidiaries did not receive any direct or indirect benefits from the settlement reached between the Falcone Entities and the TOUSA Entities, nor did they benefit from the releases which the TOUSA Entities provided to the Falcone Entities.

- The Conveying Subsidiaries did not receive any indirect benefit from forestalling TOUSA's eventual bankruptcy.

- The Conveying Subsidiaries received no net value from the acquisition of homebuilding inventory purchased through the Fraudulent Transfers. The assets were absorbed by Debtor Homes Florida, and had an approximate value of $28 million. However, these assets also came with approximately $42 million in accounts payable and customer deposit liabilities.

- The JV Settlements, which were reached on account of funds obtained by obligating the Conveying Subsidiaries on the New Debt, also compelled the TOUSA Entities to relinquish potential claims against the Defendants and to take on new indemnification and other obligations. These "non-cash" transfers would never have been made had the TOUSA entities not pledged the Conveying Subsidiaries' assets.

51.    The only tangible assets purchased in connection with the Cash Transfers were worth no more than $28 million and were contributed solely to Homes Florida. The Debtors did not receive reasonably equivalent value in exchange for the Cash Transfers or the Release and Obligation Transfers.

52.    The Debtors were individually, and on a consolidated basis, insolvent at the time of the Fraudulent Transfers, and the financing of the Fraudulent Transfers (a) rendered them

PUBLIC VERSION

more insolvent, (b) left them with unreasonably small capital, and (c) left them unable to pay their debts as they matured.

53.     Upon information and belief, the Defendants had actual or constructive knowledge that the payments made in connection with the JV Settlements were avoidable.  The Defendants were intimately familiar with the crashing Florida homebuilding market, were well aware of the financial distress suffered by the Transeastern JV, were familiar with TOUSA's operations and its various entities, and were privy to internal and publically available information reflecting the severity of the housing crisis and its impact on the Debtors' businesses.  Moreover, upon information and belief, the Defendants are sophisticated parties in the real estate market and were advised by counsel on the transaction.  Upon information and belief, the Defendants received the value of the Fraudulent Transfers, lacking good faith, and with knowledge of their avoidability.

## COUNT I

**AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS
(SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C.
§§ 544(b) AND 550)**

54.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

55.     Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

56.     The Debtors did not receive reasonably equivalent value in exchange for the Cash Transfers.

57.     On the Transfer Date, each of the Debtors:  (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they

became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

58.     At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

59.     The Cash Transfers should be avoided pursuant to, inter alia, sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b).

60.     The Cash Transfers should be avoided and recovered pursuant to, inter alia, sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550.


## COUNT II

### AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES AND 11 U.S.C. §§ 544(b) AND 550)

61.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

62.     Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

63.     The Debtors did not receive reasonably equivalent value in exchange for the Cash Transfers.

64.     On the Transfer Date, each of the Debtors either already was insolvent or became insolvent as a result of the Cash Transfer.

65.     At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

66.     The Cash Transfers should be avoided pursuant to, inter alia, sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b).

67.     The Cash Transfers should be avoided and recovered pursuant to, inter alia, sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b) and 550.

## COUNT III

### AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

68.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

69.     Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

70.     The Debtors did not receive fair consideration in exchange for the Cash Transfers.

71.     Each of the Debtors was already insolvent at the time of the Cash Transfers or was rendered insolvent as a result of the Cash Transfers.

72.     At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

73.     The Cash Transfers should be avoided pursuant to, inter alia, sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section 544(b).

74.     Any payments made in connection with the Cash Transfers should be avoided and recovered pursuant to, inter alia, sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

PUBLIC VERSION

## COUNT IV

### AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

75.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

76.    Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

77.    The Debtors did not receive fair consideration in exchange for the Cash Transfers.

78.    The capital remaining in the hands of each of the Debtors after they made the Cash Transfers was unreasonably small.

79.    At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

80.    The Cash Transfers should be avoided pursuant to, inter alia, sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b).

81.    Any payments made in connection with the Cash Transfers should be avoided and recovered pursuant to, inter alia, sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT V

### AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b) AND 550)

82.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

83.    Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

84.    The Debtors did not receive fair consideration in exchange for the Cash Transfers.

85.    At the time of the Cash Transfers, each of the Debtors intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

86.    At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

87.    The Cash Transfers should be avoided pursuant to, inter alia, sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b).

88.    Any payments made in connection with the Cash Transfers should be avoided and recovered pursuant to, inter alia, sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b) and 550.

## COUNT VI

### AVOIDANCE AND RECOVERY OF THE FRAUDULENTLY TRANSFERRED FUNDS <br> (11 U.S.C. §§ 548, 550)

89.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

90.    Any and all Cash Transfers made in connection with or on account of the JV Settlements to any Defendant should be avoided as constructive fraudulent conveyances.

91.    The Cash Transfers were made within two years of the Petition Date.

92.    The Debtors did not reasonably equivalent value in exchange for the Cash Transfers.

93.    At the time of the Cash Transfers, each of the Debtors (i) was insolvent or became insolvent as a result of the Cash Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Debtor

was an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

94.     The Cash Transfers should be avoided pursuant to, inter alia, Bankruptcy Code section 548(a)(1)(B).

95.     Any payments made in connection with the Cash Transfers should be avoided and recovered pursuant to, inter alia, Bankruptcy Code sections 548 and 550.

## COUNT VII

**AVOIDANCE OF THE NON-CASH TRANSFERS**
**(SECTIONS 726.105 AND 726.108 OF THE FLORIDA STATUTES**
**AND 11 U.S.C. §§ 544(b))**

96.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

97.     Any and all "non-cash" transfers made in connection with or on account of the JV Settlements to any Defendant, including the provision of releases, grant of indemnification, incurrence of liability, or any other transfer of an obligation or promise should be avoided as constructively fraudulent transfers.

98.     The Debtors did not receive reasonably equivalent value in exchange for the Release and Obligation Transfers to the Defendants.

99.     On the Transfer Date, each of the Debtors:  (a) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due; and/or (b) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

100.    At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

101.    The Release and Obligation Transfers should be avoided pursuant to, inter alia, sections 726.105 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b).

## COUNT VIII

### AVOIDANCE OF THE NON-CASH TRANSFERS
### (SECTIONS 726.106 AND 726.108 OF THE FLORIDA STATUTES
### AND 11 U.S.C. §§ 544(b))

102.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

103.    Any and all "non-cash" transfers made in connection with or on account of the JV Settlements to any Defendant, including, but not limited to, the provision of releases, grant of indemnification, incurrence of liability, or any other transfer of an obligation or promise should be avoided as constructively fraudulent transfers.

104.    The Debtors did not receive reasonably equivalent value in exchange for the Release and Obligation Transfers to the Defendants.

105.    On the Transfer Date, each of the Debtors was either already insolvent or became insolvent as a result of the financing required to fund the JV Settlements.

106.    At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

107.    The Release and Obligation Transfers should be avoided pursuant to, inter alia, sections 726.106 and 726.108 of the Florida Statutes and Bankruptcy Code sections 544(b).

**PUBLIC VERSION**

## COUNT IX

### AVOIDANCE OF THE NON-CASH TRANSFERS
### (SECTIONS 273 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b)

108.    The Committee repeats and realleges the allegations contained in all prior

paragraphs, which are incorporated by reference as if set forth fully herein.

109.    Any and all "non-cash" transfers made in connection with or on account of the JV

Settlements to any Defendant, including, but not limited to, the provision of releases, grant of

indemnification, incurrence of liability, or any other transfer of an obligation or promise should

be avoided as constructively fraudulent transfers.

110.    The Debtors did not receive fair consideration in exchange for the Release and

Obligation Transfers to the Defendants.

111.    On the Transfer Date each of the Debtors was already insolvent or became

insolvent as a result of the financing required to fund the JV Settlements.

112.    At all times relevant hereto, each of the Debtors had unsecured creditors within

the meaning of Bankruptcy Code sections 502 and 544(b).

113.    The Release and Obligation Transfers should be avoided pursuant to, inter alia,

sections 273 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code section

544(b).

### COUNT X
### AVOIDANCE OF THE NON-CASH TRANSFERS
### (SECTIONS 274 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW
### AND 11 U.S.C. §§ 544(b)

114.    The Committee repeats and realleges the allegations contained in all prior

paragraphs, which are incorporated by reference as if set forth fully herein.

115.    Any and all "non-cash" transfers made in connection with or on account of the JV Settlements to any Defendant, including, but not limited to, the provision of releases, grant of indemnification, incurrence of liability, or any other transfer of an obligation or promise should be avoided as constructively fraudulent transfers.

116.    The Debtors did not receive fair consideration in exchange for the Release and Obligation Transfers to the Defendants.

117.    The capital remaining in the hands of each of the Debtors after they made the Release and Obligation Transfers was unreasonably small.

118.    At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

119.    The Release and Obligation Transfers should be avoided pursuant to, inter alia, sections 274 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b).

## COUNT XI

### AVOIDANCE OF THE NON-CASH TRANSFERS
### (SECTIONS 275 AND 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW AND 11 U.S.C. §§ 544(b)

120.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

121.    Any and all "non-cash" transfers made in connection with or on account of the JV Settlements to any Defendant, including, but not limited to, the provision of releases, grant of indemnification, incurrence of liability, or any other transfer of an obligation or promise should be avoided as constructively fraudulent transfers.

122.    The Debtors did not receive fair consideration in exchange for the Release and Obligation Transfers to the Defendants.

**PUBLIC VERSION**

123.     On the Transfer Date, each of the Debtors intended or believed that it would incur debts beyond its ability to pay such debts as they matured.

124.     At all times relevant hereto, each of the Debtors had unsecured creditors within the meaning of Bankruptcy Code sections 502 and 544(b).

125.     The Release and Obligation Transfers should be avoided pursuant to, inter alia, sections 275 and 278 of the New York Debtor and Creditor Law and Bankruptcy Code sections 544(b).

## COUNT XII

## AVOIDANCE OF THE NON-CASH TRANSFERS
### (11 U.S.C. §§ 548)

126.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

127.     Any and all "non-cash" transfers made in connection with or on account of the JV Settlements to any Defendant, including, but not limited to, the provision of releases, grant of indemnification, incurrence of liability, or any other transfer of an obligation or promise should be avoided as constructively fraudulent transfers.

128.     The Debtors did not receive reasonably equivalent value in exchange for the Release and Obligation Transfers to the Defendants.

129.     The releases and promises of indemnification were made within two years of the Petition Date.

130.     On the Transfer Date, each of the Debtors (i) was insolvent or became insolvent following the provision of the releases and promises of indemnification; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Debtor was an unreasonably small capital; and/or (iii) intended to

incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

131.    The Release and Obligation Transfers should be avoided pursuant to, inter alia, Bankruptcy Code section 548(a)(1)(B).

## COUNT XIII

### OBJECTION TO ALLOWANCE OF CLAIMS
### 11 U.S.C. §§ 105, 502, 544, 548, 550 AND FRBP 3007, 7001)

132.    Defendants Century Communications of Florida Inc. and WI 825 Partners LLC (the "Claimants") filed proofs of claim on May 15, 2008 (the "Claims") for an aggregate amount of approximately $591,000 on account of obligations owed by the TOUSA Entities under the TOUSA/Falcone Settlement.  The Claimants assert that the TOUSA/Falcone Settlement required the TOUSA Entities to assume certain of the Transeastern JV obligations, including payments for cable services, property tax, and loan interest, which are owed to the Claimants.

133.    The Committee repeats and realleges the allegations contained in all prior paragraphs and counts, which are incorporated by reference as if set forth fully herein.

134.    The Claims arise out of the Release and Obligation Transfers made by the Debtors to the Falcone Entities pursuant to the TOUSA/Falcone Settlement and are predicated solely upon the rights and obligations set forth under the TOUSA/Falcone Settlement.  As alleged herein, these transfers to the Falcone Entities in the TOUSA/Falcone Settlement were made when the Debtors were insolvent, or rendered the Debtors insolvent, and were made for less than reasonably equivalent value.  The Fraudulent Transfers should, therefore, be avoided.

135.    Absent the Fraudulent Transfers, the Claimants have no valid basis for the Claims that the TOUSA Entities owe them payment.

PUBLIC VERSION

136.    In addition, section 502(d) of the Bankruptcy Code provides in relevant part as follows: "the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."  This provision requires the disallowance of the claim of any prepetition creditor that has received an avoidable transfer until that creditor has turned over or repaid the transferred property.  Thus, because the Falcone Entities have received the Fraudulent Transfers, any other claims assertable against the Debtors by the Falcone Entities should be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Debtors' estates recover the Fraudulent Transfers.

137.    Thus, pursuant to, inter alia, sections 105, 502, 544 and 548 of the Bankruptcy Code, and Federal Rules of Bankruptcy Procedure 3007 and 7001, the Claims should be disallowed in their entirety.

## RESERVATION OF RIGHTS

138.    The Committee believes that additional causes of action in favor of one or more of the Debtors' estates against the Defendants and/or other parties may exist.  The Committee also believes that additional objections to the Claims exist and intends to file formal objections thereto within any deadlines that may be established by this Court.  The Committee, therefore, reserves any and all rights to bring such causes of action or file such objections, subject to applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an

order:

(1)    avoiding and granting recovery of all Cash Transfers, and any other payments of monies, to the Defendants in connection with the JV Settlements;

(2)    avoiding all Release and Obligation Transfers, and any other non-cash transfers, made in favor of the Defendants in connection with the JV Settlements;

(3)    disallowing the Claims of Century Communications of Florida Inc. and WI 825 Partners LLC, and any other prepetition claim by any Defendant based upon obligations set forth in the JV Settlements in their entirety, or in the alternative, pursuant to section 502(d), disallowing the Claims until the Claimants have repaid any transferred property they may have received; and

(4)    granting such other and further relief, including to the extent warranted, equitable subordination, as the Court deems just, proper and equitable, including the fees, costs, interest, and expenses of this action.

January 26, 2010

I hereby certify that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to Court orders dated November 6, 2009, February 27, 2008, March 3, 2008 and January 11, 2010.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
By: /s/ Jessica S. Budoff

Stephen M. Baldini (New York Bar No. 2428381)
Daniel H. Golden (New York Bar No. 1133859)
Philip C. Dublin (New York Bar No. 2959344)
Jessica S. Budoff (New York Bar No. 4431821)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Co-Counsel to the Official Committee of Unsecured Creditors of TOUSA, Inc., et al.*